# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| MARY SUE UMFLEET, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1: 20 CV 97 DDN |
| ) | |
| ANDREW M. SAUL, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Mary Sue Umfleet for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434, and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born in 1965 and was 53 years old at the time of the ALJ's decision. She filed her applications on October 13 and 20, 2016, respectively, alleging a September 13, 2016 onset date. (Tr. 408-16.) She claimed she was disabled due to Sjogren's syndrome, fibromyalgia, rheumatoid arthritis, Raynaud's syndrome, diabetes, lupus, pain in her abdomen, knee, low back, shoulder, neck, and hip, GERD, sleep apnea, and depression. (Tr. 299.) Her applications were denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 299-307.)

On December 20, 2017, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 15-29.) The Appeals Council denied her request for review. (Tr. 1-7.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On November 3, 2014, plaintiff saw Amjad Roumany, M.D., a rheumatologist, for evaluation of possible autoimmune disease. She reported having symptoms of diffuse joint aches. She was positive for fatigue, dyspnea or shortness of breath with exertion, mouth ulcers, headaches, and dry mouth. (Tr. 671.)

On January 2, 2015, she reported continued discomfort in her muscles, fatigue, and swelling on the left side of her neck. Dr. Roumany ordered a biopsy of her salivary glands to rule out Sjogren's syndrome, an autoimmune disease identified by its two most common symptoms, dry eye and dry mouth. The biopsy was consistent with Sjogren's. (Tr. at 675-77, 721-22.)

On February 9, 2015, plaintiff started on hydroxychloroquine, an immunosuppressant. On July 16, 2015, plaintiff saw Dr. Roumany for follow up, reporting pain in her left hip, left shoulder, and legs at a level 8 or 9 out of 10. He administered injections to her shoulder and hip and prescribed prednisone. (Tr. 682-88.)

On October 19, 2015, plaintiff told her primary care physician, Joy Ledoux-Johnson, M.D., that she continued to have generalized pain at level 4/10. A review of her systems was positive for arthralgia, back pain, limb pain, myalgia, and bilateral upper extremity paresthesia. Dr. Ledoux-Johnson increased her Butrans, an opiod for pain. (Tr. 631.)

On October 26, 2015, plaintiff saw Sophia Weinmann, M.D., a rheumatologist, for an evaluation. She reported symptoms of dry eyes and mouth, intermittent episodes of

tongue and face swelling, left shoulder and neck pain, headaches, bilateral hip pain and stiffness, knee pain, myalgia of the forearms, pain in the thighs, and dyspnea on exertion. Dr. Weinmann noted limited range of motion in the neck and left shoulder on exam. Imaging of her left shoulder showed left acromioclavicular osteoarthritis. Dr. Weinmann diagnosed muscle spasm; lateral epicondylitis, an inflammation to the area of the elbow, pain in the left shoulder region; and sicca, also known as Sjogren's syndrome. Dr. Weinmann recommended she wear a forearm strap during the day and avoid repetitive lifting/carrying, which could aggravate her epicondylitis. (Tr. 541-44.)

She continued to have hip and knee pain, and on January 5, 2016, she reported feeling dizzy and experiencing chest pain and shortness of breath. A stress test was normal, although chest discomfort persisted. On February 4, 2016, Dr. Ledoux-Johnson noted the pain was likely musculoskeletal and prescribed Celebrex, a non-steroidal anti-inflammatory drug (NSAID), and Butrans. (Tr. 570, 623-25.)

On February 24, 2016, plaintiff told Dr. Roumany that she continued to have knee and shoulder pain, stiffness, and swelling. Dr. Roumany noted myofascial tender points in her elbows, knees, trapezius muscle area, second rib area, and cervical and lumbar spine area. He diagnosed fibromyalgia, and prescribed cyclobenzaprine, a muscle relaxant, and tramadol, a narcotic-like pain reliever for pain. (Tr. 690-93.)

On March 4, 2016, plaintiff saw Dr. Ledoux-Johnson. She reported that her narcotic medication was effective and that she was having a flareup of her myalgia. Dr. Ledoux-Johnson prescribed Cymbalta, an anti-depressant used to treat fibromyalgia. (Tr. 620-22.)

On August 3, 2016, she saw Dr. Roumany, reporting discoloration in her fingers with cold exposure. He diagnosed Raynaud's phenomenon, a disease that causes some areas, such as fingers and toes, to feel numb and cold in response to cold temperatures or stress, and advised her to avoid cold exposure and to wear mittens. (Tr. 644-47.)

On September 23, 2016, plaintiff told Dr. Roumany that she was not doing well; she was having pain and swelling in her hands and numbness in her feet and fingers. He prescribed prednisone. (Tr. 649, 651.)

Barry Burchett, M.D., performed a consultative examination on February 6, 2017. Plaintiff reported symptoms of dry mouth, blurring vision, pain in her toes, crepitus or cracking in both knees, and pain in the right lateral epicondyle, causing her to drop things periodically. Examination revealed plaintiff walked with a normal gait and appeared stable and comfortable while seated and standing. Her shoulders, elbows and wrists were non-tender and there was no redness, warmth, or swelling. She had no swelling, atrophy, redness, warmth, or tenderness in her hands, she could pick up a coin, and she had full range of motion of her fingers. Examination of her legs was negative except for some crepitus or cracking of her knees, worse on the left. She had no tenderness or spasm of her cervical or dorsolumbar spine. Straight leg raising was negative and she could stand on one leg without difficulty. Neurological examination revealed a normal gait and no motor atrophy. She had diminished vibratory sensation in both feet. Dr. Burchett's impression was Type 2 diabetes with neuropathy, Sjogren's syndrome, right lateral epicondylitis, possible rheumatoid arthritis by history, gastroesophageal reflux disease (GERD), and history of recurrent kidney stones. (Tr. 660-63.)

On February 16, 2017, non-examining State agency physician Joanna Mace M.D., opined that plaintiff could perform a limited range of light exertional activity with occasional postural activity and some environmental limitations. She could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; occasionally climb ramps/stairs and ladders/ropes/scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. 275-77.)

On November 7, 2017, plaintiff was seen in the emergency room for back, shoulder, right hip, and toe pain. She needed medication refills, but no longer had insurance or a physician, and had not taken medication for over a year. Examination revealed her back was non-tender with full range of motion and her extremities were non-tender with no redness or edema. She had no motor or sensory deficits. She had recently been able to obtain financial assistance through Southeast Hospital and was prescribed diclofenac, an NSAID. (Tr. 705-06.)

On December 5, 2017, Matthew Karshner, M.D., a physical medicine rehabilitation specialist, administered a lidocaine injection. Imaging two weeks later showed mild right sacroiliac joint arthropathy.

One month later, at a January 5, 2018 visit with Dr. Karshner, plaintiff had full strength and sensation in her lower extremities. Leg raising was negative and her joints were normal. Plaintiff told Dr. Karshner that the injection a month earlier had not been effective. He prescribed tramadol and administered a gluteal trigger point injection. (Tr. 704, 750-56.)

In February 2018, plaintiff was treated for a kidney stone. Her back was non-tender with full range of motion, her extremities were non-tender, and she had no motor or sensory deficits. (Tr. 697.)

In March 2018, she had negative leg raises, 5/5 strength, normal sensation, no muscle mass loss and normal muscle tone. A nerve conduction study of her right leg was normal. Electrodiagnostic testing on March 12, 2018 was suggestive of right sacroiliac radiculopathy, and Dr. Karshner prescribed Neurontin or gabapentin, used to treat nerve pain. (Tr. 696, 747.) At an examination later that month, plaintiff reported some benefit from Neurontin. Leg raising was negative, sensation was normal, and she had full strength. She had normal flexion of her back, but decreased extension, lateral bending, and rotation with extension. (Tr. 745.)

On June 5, 2018, Dr. Roumany completed a one-page "arthritis questionnaire," which consisted of five questions. Dr. Roumany stated the following. Plaintiff had persistent pain and fatigue, depending on the flareup. She would not be able to perform in a sedentary job because of persistent fatigue and pain, again depending on the flare up, and she would need to miss work or leave early one to two times a week for one to two days. She would have difficulty using both upper extremities on a persistent basis throughout a normal workday because of her Sjogren's disease, fibromyalgia, Raynaud's phenomenon, and arthralgia in her hands and toes. In his opinion, plaintiff's limitations had existed since August 3, 2016. (Tr. 743.)

On February 18, 2019, plaintiff saw Nivedita Nagam, M.D., internist and rheumatologist, to establish care. Plaintiff told Dr. Nagam that she had lost her health insurance two years earlier and had been off her medications since then. She reported symptoms of morning stiffness, chest congestion, joint pain, swelling of the hands, and numbness of the fingers and toes. Dr. Nagam instructed her to continue gabapentin, used to treat nerve pain. (Tr. 782-84.) On March 4, 2019, Dr. Nagam prescribed meloxicam, an NSAID, as well as cyclobenzaprine. (Tr. 183-86.)

Plaintiff returned to Dr. Roumany on April 15, 2019, reporting continued joint pain and neuropathy. Dr. Roumany administered injections to her left knee and shoulders. Two weeks later she reported that the injections had helped significantly except for her left shoulder. Dr. Roumany administered another injection to her left shoulder. (Tr. at 143-50.)

Imaging of plaintiff's left shoulder on August 15, 2019, showed degenerative changes of the left acromioclavicular joint. The same day she also sought treatment for daily migraine headaches, which could last for several days and were associated with photophobia, phonophobia, nausea, and vomiting. She reported intermittent vertigo with her headaches. She was started on Topamax, used to treat migraines, and referred for a sleep study. (Tr. 21, 32, 36.) The sleep study, completed on August 29, 2019, showed obstructive sleep apnea. (Tr. 50.)

On September 19, 2019, plaintiff reported that her headaches continued and that she didn't feel much different using Topamax. She was prescribed Axert, for migraines. On October 31, 2019, she reported infrequent, intermittent headaches. (Tr. 108, 111-13.)

On September 10, 2019, plaintiff saw James Edwards, M.D., orthopedic surgeon, for evaluation of her left shoulder and right ankle which she had injured in a fall one or two months earlier. He diagnosed left shoulder impingement, highly suspicious for a full-thickness rotator cuff tear and a probable right peroneal tear. An MRI of her left shoulder showed mild to marked rotator cuff tendinosis, mild osteoarthritis, and mild degenerative changes of the AC joint. (Tr. 75, 87-90.)

On October 24, 2019, she underwent surgery for rotator cuff repair on her left shoulder. (Tr. 79-85). Following surgery, she fell in the shower. On November 7, 2019, she saw Dr. Edwards with increased left shoulder pain, as well as right shoulder pain. He instructed her to wear her sling at all times. She continued to report experiencing dizziness. On October 15, 2019, she was diagnosed with vertigo. (Tr. 77-85, 95, 119, 126.)

**ALJ Hearing**

On March 11, 2019, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 219-65.) She stopped working after she was terminated for being unable to perform her job as a data entry clerk. She had difficulty typing because of pain in her fingers, as well as difficulty concentrating because of pain in her feet. She looked for employment after losing her job, but was unable to stand on her feet and her symptoms worsened. She received unemployment benefits for 22 weeks after losing her job. She experiences headaches, frequent falls, forgetfulness, irritability, joint pain, and pain and numbness in her hands, making it difficult to hold objects. Injections and medications helped "a little," although she still has pain. She began seeing her rheumatologist, Dr. Rhoumany in 2015, but had to stop seeing him because she could not afford it. She now receives Medicaid and will probably start seeing him again. (Tr. 224-56.)

As to activities of daily living, she can stand in one place for 10 to 15 minutes at a time before needing to sit down. Sitting is sometimes uncomfortable as well. She typically puts her feet up in a recliner at home. She can wash dishes but doesn't shop or drive. She doesn't sleep well because of pain in her legs and muscles, making it difficult to climb the steps into her home. (Tr. 242, 245-49.)

A vocational expert also testified at the hearing. The ALJ proposed a hypothetical individual who was limited to occasionally lifting and carrying 20 pounds and frequently lifting and carrying 10 pounds. The individual could stand and walk for six out of eight hours; sit for six out of eight hours; occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and who should avoid concentrated exposure to extreme cold, vibration, and workplace hazards. The vocational expert testified that such an individual could perform plaintiff's past relevant work as a data entry clerk. If the individual were limited to frequent handling, fingering, and feeling bilaterally, then past relevant work would be eliminated; however, the positions of marker, housekeeper, and router would still be available. If the individual were further limited to only occasional handling, fingering, and feeling bilaterally, he or she could perform light work as a furniture rental clerk. (Tr. 263-65.)

The vocational expert testified that employers for jobs such as these would typically tolerate an employee being off task 10 percent of the time. However, being absent one day per month on a consistent, routine basis would not be tolerated. (Tr. 266.)

### III.   DECISION OF THE ALJ

On April 2, 2019, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 154-56.) At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since September 13, 2016, her alleged onset date. At Step Two, the ALJ found that plaintiff had the severe impairments of Sjogren's syndrome, fibromyalgia, rheumatoid arthritis, Raynaud's phenomenon, Type II diabetes, and lupus. At Step Three,

the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in the Commissioner's list of presumptively disabling impairments, 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 157-58.)

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform light work with the following limitations.  She was able to lift/carry lift up to 20 pounds occasionally and up to 10 pounds frequently.  She could stand/walk for up to 6 hours in an 8-hour day.  She could occasionally climb ramps and stairs, and occasionally climb ladders, ropes or scaffolds.  She could occasionally balance, stoop, kneel, crouch and crawl.  She would need to avoid extreme cold, vibration and hazards.  (Tr. 159.)

With this RFC, the ALJ found that plaintiff could perform her past relevant work as a data entry clerk.   The ALJ therefore concluded that plaintiff was not "disabled" under the Act.  (Tr. 174.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole.  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.*  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  *Id.*  As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental

impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). *Id.* § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff's sole argument on appeal is that the ALJ erred in failing to evaluate the opinion evidence of treating source Dr. Amjad Roumany. She asserts the ALJ erred in giving Dr. Roumany's opinion "little weight" and instead crediting the non-examining state agency consultant. She contends the ALJ failed to provide sufficient reasons for giving little weight to Dr. Roumany's opinion, citing, among other things, the factors set forth in 20 C.F.R. § 404.1527 for analyzing medical opinion evidence. She contends the ALJ's formulation of her RFC is therefore not supported by substantial evidence. The Court disagrees.

The opinion of a treating physician controls if it is well supported by medically acceptable diagnostic techniques and is not inconsistent with the other substantial evidence. *Prosch v. Astrue*, 201 F.3d 1010, 1012-13 (8th Cir. 2012) (mirroring language of 20 C.F.R. §§ 404.1527 and 416.927). The treating source's opinion is not inherently entitled to controlling weight, however. *Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir. 2000). Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

In assessing a medical opinion, an ALJ may consider factors including the length of the treatment relationship and the frequency of examination, the nature and extent of treatment relationship, supportability with relevant medical evidence, consistency between the opinion and the record as a whole, the physician's status as a specialist, and any other relevant factors brought to the attention of the ALJ. See 20 C.F.R. § 404.1527(c)(1)-(6); *Owns v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (holding that when a treating physician's opinion is not entitled to controlling weight, the ALJ must consider several factors when assessing the weight to give it). Although an ALJ is not required to discuss all the relevant factors in determining what weight to give a physician's opinion, the ALJ must explain the weight given the opinion and give "good reasons" for doing so. See 20 C.F.R. § 404.1527(c)(2).

The ALJ gave good reasons here. And he considered the relevant factors. As detailed above, plaintiff was treated by Dr. Roumany from November 3, 2014 through September 13, 2016, the date of her last visit. On June 5, 2018, approximately 21 months after her last visit, Dr. Roumany completed the arthritis questionnaire. The ALJ stated that he gave little weight to Dr. Roumany's opinion because he had not treated plaintiff during her alleged period of disability. The ALJ cited plaintiff's testimony that she had not received treatment from Dr. Roumany during the two years for which he submitted his statement. The ALJ noted Dr. Roumany's findings were not consistent with the objective testing and medical records during that period. The ALJ also found it implausible that Dr.

Roumany could opine about plaintiff's limitations since August 3, 2016, when on June 5, 2018, the date of the questionnaire, he had not seen her since September 2016. The ALJ also observed that the evidence as a whole did not support Dr. Roumany's highly restrictive opinion. Instead, when determining RFC, the ALJ balanced all the opinion evidence, including the opinions of consulting and reviewing sources who did not think plaintiff was as limited as Dr. Roumany suggested. The ALJ also considered other record evidence that was inconsistent with plaintiff's complaints, including the fact that she was fired from her jobs for insubordination, that she applied for and received unemployment benefits and searched for work during the same period she alleged disability, and her generally mild medical findings.

Plaintiff principally relies on *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003). However, *Shontos* is not on point. *Shontos* held that the regulations do not define a treating source as one who is currently treating a claimant at the time a questionnaire is completed. *Id.* at 425. The court in *Shontos* found the ALJ erred in discounting a treating psychologist's opinion because the psychologist had not treated the claimant for six months prior to issuing an opinion on functioning. *Id.* It also held that the ALJ did not give adequate reason to discount the opinions of three mental health care providers, including a clinical psychologist, a nurse practitioner, and a certified therapist, all three of whom the court found had collectively provided a longitudinal perspective of the claimant over an eighteen month period. In this case, Dr. Roumany tendered an opinion about plaintiff's limitations after having not treated her for nearly two years. Further the entire treatment period, except for two weeks, was prior to plaintiff's alleged onset date. The Court finds the ALJ gave adequate reason to discount the opinion of Dr. Roumany.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

_____
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Dated this 12th day of February 2021.